Philip A. FEIGIN, Securities Commissioner for the State of Colorado,
Plaintiff–Appellant,

v.

DIGITAL INTERACTIVE ASSOCIATES, INC.; Terry K. Vickery; Michael S. Beeler; Robert Kirk; Paul Montroy; Jay Katz; Jamie Tsutsui; Kenneth King; Paul Weidmaier; Anton Walker; Russ Howard; Barbara Beagan; Elizabeth Littleton; Charles (Chas) Gunther; and Douglas Ethan Mallach, Defendants–Appellees.

No. 95CA0387.

Colorado Court of Appeals,
Div. I.

Feb. 4, 1999.

Rehearing Denied March 11, 1999.*

Certiorari Denied Oct. 18, 1999.**

* METZGER, J., would grant.        ** Justice RICE does not participate.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, William Higgins, Assistant Attorney General, M. Ashley Albright, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellant.

McAllister & Murphy, P.C., Robert T. McAllister, Kathryn Haight, Denver, Colorado, for Defendants–Appellees Digital Interactive Associates, Inc.; Terry K. Vickery; Michael S. Beeler; Robert Kirk; Paul Montroy; Jay Katz; Jamie Tsutsui; Kenneth King; Paul Weidmaier; Anton Walker; Russ Howard; Barbara Beagan; Elizabeth Littleton; and Charles (Chas) Gunther.

Haddon, Morgan & Foreman, P.C., Harold A. Haddon, Saskia A. Jordan, Pamela R. Mackey, Denver, Colorado, for Defendant–Appellee Douglas Ethan Mallach.

Opinion by Judge ROY.

Plaintiff, Phillip A. Feigin, Colorado Securities Commissioner (the commissioner), appeals the trial court's denial of his summary judgment motion asserting qualified immunity as to a counterclaim asserted by defendants, Digital Interactive Associates, Inc., Terry K. Vickery, Michael S. Beeler, Robert Kirk, Paul Montroy, Jay Katz, Jamie Tsutsui, Kenneth King, Paul Weidmaier, Anton Walker, Russ Howard, Barbara Beagen, Elizabeth Littleton, Charles (Chas) Gunther, and Douglas Ethan Mallach. We reverse.

Digital Interactive Associates, Inc., (Digital) is a venture capital firm which sold interests in IVDS Interactive Acquisition Partners (IVDS), a Nevada general partnership with offices in Florida using, allegedly, scripted "cold calling." The individual defendants were Digital corporate officers and sales representatives.

The investigation of Digital's activities was apparently prompted by inquiries from several individuals who had been approached by telephone with an opportunity to purchase units in IVDS for $6,000 each. IVDS was formed to participate in an auction to be conducted by the Federal Communications Commission at which licenses to operate interactive video and data services were to be sold.

Search warrants for the search of Digital's offices and banks were obtained based on the affidavit of an investigator in the commissioner's office. The execution of the search warrant on the banks resulted in some of Digital's bank accounts being temporarily frozen or rendered inaccessible.

Among other matters, the affidavit described and characterized written materials provided to investors, or potential investors, describing the partnership and its business purpose. This description included the undisputed fact that the affairs of the partnership would be managed by a previously elected Management Committee.

In addition, the affidavit stated:

Your affiant then made available a copy of each interview memorandum with promotional materials for each of the individuals who had been solicited and then contacted the DIVISION [Division of Securities] and your affiant's investigative reports to Philip A. Feigin ... for his review.... After Commissioner FEIGIN also reviewed the information in the previous paragraphs of this affidavit, and took particular note of the IVDS partnership agreement, he concluded the IVDS investment arrangement, including the selling of units in this 'general partnership', is an 'investment contract' and therefore falls within the definition of a 'security' pursuant to section 11–51–201(17), C.R.S. (1993). Commissioner FEIGIN told your affiant that his conclusion is based on Colorado case law holding that an 'investment contract' is an arrangement with the expectation of a profit based upon the essential managerial efforts of the promoter or a third party. Commissioner FEIGIN concluded from his review of the materials pertaining to IVDS and DIGITAL that investors are being solicited by DIGITAL to invest money in the IVDS venture with the expectation that they, the investors, will earn a profit on their investments

based on essential managerial efforts of IVDS, DIGITAL, Carlo Annede and Terry Vickery in raising funds for the IVDS venture and IVDS then successfully setting up and marketing the appropriate licenses and television stations. Therefore, according to Commissioner FEIGIN, the purported general partnership interests being offered and sold by IVDS and DIGITAL are 'investment contract securities.'

In subsequent challenges to the search warrant and in the counterclaim at issue here, defendants have relied on the failure of the commissioner to cite *Banghart v. Hollywood General Partnership*, 902 F.2d 805 (10th Cir.1990) in his opinion and have asserted that the omission made the affidavit false or misleading.

In *Banghart*, while stating that there is a strong rebuttable presumption that an interest in a general partnership is not a security, the court held that the inquiry as to whether such an interest is a security is limited to the partnership agreement and the substantive state partnership law.

After execution of the search warrant, the commissioner filed a civil complaint against defendants alleging various violations of securities laws, and obtained an *ex parte* temporary restraining order (TRO) freezing assets prohibiting the individual defendants from, *inter alia*, accessing their personal bank accounts and various other personal assets. In the affidavit supporting the motion for the TRO, the commissioner's investigator again stated the commissioner's opinion that a partnership interest in IVDS was a security under Colorado law and again failed to cite the *Banghart* case.

Defendants do not dispute the truth of the representation that the commissioner held the opinion expressed, or that the affidavits prepared by his agent accurately reflected that opinion. Defendants do dispute the commissioner's conclusion that a partnership interest in IVDS marketed by them was a security under Colorado law, and they did allege that the commissioner's failure to cite the *Banghart* case was intentional and knowing.

Defendants filed an emergency motion to modify the *ex parte* TRO. The trial court, acting through the judge who originally issued the TRO, concluded that the issuance of the TRO without notice had not been necessary on the grounds that the previously issued and executed search warrant had effectively frozen Digital's bank accounts, at least temporarily. The trial court, acting through a different judge, subsequently dissolved the TRO in its entirety as to the individual defendants and their funds were released.

Defendants then filed a counterclaim against the commissioner, individually, based on 42 U.S.C. § 1983 (1994), alleging a violation of their Fourth Amendment and procedural and substantive due process rights. The commissioner filed a motion to dismiss pursuant to C.R.C.P 12(b) or, alternatively, for summary judgment pursuant to C.R.C.P. 56, on the grounds of qualified immunity. The trial court denied the motion and the commissioner's appeal of that denial to this court was dismissed. The commissioner then filed a petition for a writ of certiorari with the supreme court which was granted, and the matter was remanded to the trial court, without opinion, for reconsideration in light of that court's opinion in *City of Lakewood v. Brace*, 919 P.2d 231 (Colo.1996).

Upon reconsideration, the trial court found that 1) the commissioner's failure to cite the *Banghart* case in the affidavit in support of the search warrant was a material omission which violated clearly established Fourth Amendment rights; 2) that the commissioner's conduct in failing to inform the court of parallel criminal proceedings at the time the TRO was requested violated defendants' clearly established procedural due process rights; 3) that defendants had not stated a substantive due process violation; and 4) that genuine issues of material fact remained as to the commissioner's state of mind, making the entry of summary judgment improper. This appeal followed.

## I.

■ We first address, and reject, defendants' assertion that the interlocutory appeal must be dismissed for lack of a reviewable order.

■ The denial of a motion to dismiss pursuant to C.R.C.P 12(b), or a motion for summary judgment pursuant to C.R.C.P. 56, is normally not reviewable, much less immediately reviewable, as they are not final orders. Section 13–4–102, C.R.S.1998; *City of Lakewood v. Brace, supra.*

In *City of Lakewood v. Brace, supra,* however, the supreme court announced a two-part test for deciding whether an order denying a motion for summary judgment asserting qualified immunity is immediately appealable. First, the trial court must determine as a matter of law whether the alleged facts state a violation of a clearly established constitutional right. If the answer to this question is in the affirmative, the inquiry stops and that determination is immediately reviewable on appeal. But, if the answer to the question is in the negative, then the trial court must determine whether there are genuine issues as to a material fact such that the issue of qualified immunity must be decided by a fact finder. This second determination is not reviewable.

Defendants contend that this is not an appropriate interlocutory appeal and this court lacks jurisdiction because the commissioner does not challenge whether the rights he may have violated were clearly established but rather he appeals the factual issue of whether he actually violated those rights. We disagree as to the nature of the commissioner's challenge.

In challenging the trial court's order, the commissioner asserts that the failure to cite a persuasive appellate decision in an affidavit supporting the issuance of a search warrant or temporary restraining order does not rise to the level of rendering the affidavit false or misleading. In reviewing this issue, we must assume that the omission of the citation was intentional and knowing, as alleged.

In addition, with respect to the TRO, and relying on § 11–51–602, C.R.S.1998, the commissioner asserts that he is not required to allege exigent circumstances and need not notify opposing counsel prior to presenting his request for a TRO to the court.

In other words, he does not challenge the factual bases of the trial court's order, but,

rather, its legal analysis and conclusion. Therefore, in our view, this appeal should not be dismissed.

## II.

### A. Qualified Immunity

The commissioner contends that the trial court erred in denying his summary judgment motion requesting a finding that he was immune from suit under the doctrine of qualified immunity. We agree.

■ The standard of review for the granting or denial of a motion for summary judgment pursuant to C.R.C.P. 56 is *de novo. Craft v. Storey,* 942 P.2d 1211 (Colo.App.1996)(motion granted); *McCloud v. Testa,* 97 F.3d 1536 (6th Cir.1996)(motion asserting qualified immunity denied).

In that regard, we note that the judge denying the commissioner's motion for summary judgment did not issue the search warrant or the TRO, did not modify or dissolve the TRO, and did not conduct any evidentiary hearing. We are, therefore, in the same position as the trial court with respect to the issue of whether the affidavit in support of a search warrant was materially misleading, making *de novo* review additionally appropriate.

■ The determination by a trial court that an affidavit in support of a search warrant adequately establishes probable cause is to be given great deference on review. *People v. Pate,* 878 P.2d 685 (Colo.1994). However, review of the determination by a trial court that an affidavit establishes probable cause after erroneous information is redacted, or it is supplemented with exculpatory information, pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), is *de novo. State v. Buccini,* 167 Ariz. 550, 810 P.2d 178 (1991).

■ Qualified immunity is immunity from suit, not merely a defense to liability. *Moody v. Ungerer,* 885 P.2d 200 (Colo.1994).

■ Litigants seeking to overcome qualified immunity have the burden of both alleging a violation of a constitutional right, and of demonstrating that the right was clearly es-

tablished at the time of the conduct in question so that a reasonable defendant would have understood that his or her conduct violated that right. *City of Lakewood v. Brace, supra; see also Garramone v. Romo,* 94 F.3d 1446 (10th Cir.1996).

◼ Whether a right is clearly established is a question of law, and, in reviewing a qualified immunity determination, we must use our full knowledge of all relevant precedents. *Freedom from Religion Foundation, Inc. v. Romer,* 921 P.2d 84 (Colo.App.1996).

Under the first prong of the *Brace* test, we must first determine whether the facts sufficiently state a violation of a clearly established Fourth Amendment right. We conclude they do not.

◼ Probable cause exists when the affidavit in support of the application for a search warrant alleges sufficient facts to cause a person of reasonable caution to believe that evidence of criminal activity is located at the place to be searched. *People v. Turcotte–Schaeffer,* 843 P.2d 658 (Colo.1993).

◼ It is a clearly established violation of the Fourth Amendment for an affiant knowingly or recklessly to omit from an application for a search warrant material facts which, if included, would vitiate or dilute a probable cause finding. *Higgs v. District Court,* 713 P.2d 840 (Colo.1985). A fact is material only if its omission rendered the affidavit substantially misleading to the judge who issued the search warrant. *People v. Fortune,* 930 P.2d 1341 (Colo.1997); *People v. Page,* 907 P.2d 624 (Colo.App.1995). The issue, then, is whether the absence of a citation to the *Banghart* case rendered the affidavit in support of the search warrant and in support of a temporary restraining order substantially misleading.

◼ Under Colorado law, a "security" includes an "investment contract" to the same extent as an "investment contract" is covered under the Securities Act of 1933. 15 U.S.C. § 77(b)(1) (1994); *Straub v. Mountain Trails Resort, Inc.,* 770 P.2d 1321 (Colo.App.1988). An investment contract means a contract, transaction, or scheme by which a person invests his money in a common enterprise and is led to expect profits *solely* from the efforts of a third party. *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); see also *Straub v. Mountain Trails Resort, Inc., supra; Lowery v. Ford Hill Investment Co.,* 192 Colo. 125, 556 P.2d 1201 (1976).

In the *Banghart* case, as previously indicated, the court held that the inquiry into whether an interest in a general partnership was a security under *S.E.C. v. W.J. Howey Co., supra,* was limited to whether management powers were reserved in the partnership agreement, not whether the general partners actually exercised those powers. The *Banghart* analysis is, apparently, the minority view; and, in our view, is not the better reasoned view.

The generally recognized leading case on this question is *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.1981). The *Banghart* court recognized *Williamson* as the leading case but felt constrained to follow the minority view previously expressed in *Maritan v. Birmingham Properties,* 875 F.2d 1451 (10th Cir.1989).

In *Williamson,* the court held that the determination as to whether a general partnership was an investment contract, and therefore a security, under *Howey* is to be made on the basis of substance, or economic reality, not form.

After an extended discussion of the existing authority, the court summarized the state of the law as follows:

> It should be clear from the context of the cases discussed above, however, that the mere fact that an investment takes the form of a general partnership or joint venture does not inevitably insulate it from the reach of the federal securities laws. All of these cases presume that the investor-partner is not in fact dependent on the promoter or manager for the effective exercise of his partnership powers. If, for example, the partner has irrevocably delegated his powers, or is incapable of exercising them, or is so dependent on the particular expertise of the promoter or manager that he has no reasonable alternative to reliance on that person, then his partnership powers may be inadequate to

protect him from the dependence on others which is implicit in an investment contract. Thus, a general partnership in which some agreement among the partners places the controlling power in the hands of certain managing partners may be an investment contract with respect to the other partners.... In such a case the agreement allocates partnership power as in a limited partnership, which has long been held to be an investment contract.... Similarly, one would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many partners that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single .shareholder in a corporation. Such an arrangement might well constitute an investment contract.

A general partner or joint venturer who lacks the business experience and expertise necessary to intelligently exercise partnership powers may also be dependent on the investment's promoter or manager.... A scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labeling itself a general partnership or joint venture. Such investors may be led to expect profits to be derived from the efforts of others in spite of partnership powers nominally retained by them.

A genuine dependence on others might also exist where the partners are forced to rely on some particular non-replaceable expertise on the part of a promoter or manager. Even the most knowledgeable partner may be left with no meaningful option when there is no reasonable replacement for the investment's manager.... It is not enough, therefore, that partners in fact rely on others for the management of their investment; a partnership can be an investment contract only when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control.

*Williamson v. Tucker, supra,* 645 F.2d at 422–23.

The *Williamson* court then formulated a non-exclusive analysis to assist in determining whether an entity denominated a general partnership is, in fact, an investment contract. The court stated:

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson v. Tucker, supra,* 645 F.2d at 424.

▬▬▬▬ Here, the affidavit in support of the search warrant stated that the partnership interests in IVDS were being marketed by Digital by telephone to persons, generally senior citizens, in several states in scripted calls in an operation described as a "boiler room"; that IVDS was a general partnership under the management of a committee consisting of three persons with television, management, government bidding, and capitalization experience; that IVDS was variously described as a Nevada and a Florida general partnership; and that the partnership interests in IVDS were not registered in Colorado or with the appropriate federal agency.

While there is no direct representation of the number of anticipated partners, the documents attached to the affidavit in support of the search warrant indicate that each partnership unit would cost $6,000 and the partnership would escrow $2,400,000 to develop the license. Thus, if no promotional expense is assumed, a minimum of 400 investors were anticipated. In addition, according to the documents attached to the affidavit, the experience and expertise of the management committee in the industry were emphasized.

Therefore, it would appear from the affidavit and its attachments that a significant number of the investors would be senior citizens; that the investors would be strangers to the promoter; that the investors would be strangers to each other; that the investors would be widely scattered geographically; that the investors would be solicited without regard to whether they had any expertise, or prior interest in, the business of the partnership; that there would be a large number of partners, in excess of 400; and that the management of the partnership would be vested in a management committee with expertise.

Consequently, even without the opinion of the commissioner, the affidavit in support of the search warrant with attachments was sufficient, in our view, to establish probable cause to believe that a partnership interest in IVDS was an investment contract and therefore a security under Colorado law. Hence, in our view, the failure of the commissioner to cite in his opinion a case expressing the minority, and in our view unpersuasive appellate decision, did not detract, much less materially detract, from the validity of the affidavit. Therefore, a reasonable person in the position of the commissioner would not have been on notice that the omission of the citation would violate any clearly established constitutional right of defendants, or make the affidavit in support of the search warrant materially misleading even if the citation were intentionally omitted.

With respect to the affidavit in support of the TRO, the matter is even clearer as additional documents were attached to the complaint filed in this action which further support the determination that, at least for the purposes of the affidavit, a partnership interest in IVDS appears to be an investment contract or security.

We conclude that the commissioner's conduct in omitting from his opinion, and his agents' failure subsequently to include, the case citation in the affidavit in support of the issuance of the search warrant and TRO is not an act or omission so clearly unconstitutional that any reasonable person would have known that his conduct violated defendants' Fourth Amendment or other rights.

## B. Procedural Due Process

The commissioner also argues that the trial court erred in denying his motion for summary judgment with respect to the application for issuance of the TRO. More particularly, the commissioner argues that he did not violate any clearly established due process rights of defendants by failing to notify defendants' counsel of the application for the TRO. We agree.

C.R.C.P. 65(b) provides:

A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if: (1) *It clearly appears from specific facts ... that immediate and irreparable injury, loss, or damage will result to the applicant* before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing or on the record the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required. (emphasis added)

With respect to the securities commissioner, however, § 11–51–602(1), C.R.S.1998, provides:

Whenever it appears to the securities commissioner upon sufficient evidence satisfactory to the securities commissioner that any person has engaged in or is about to engage in any act or practice constituting a violation of any provision of this article or of any rule or order under this article, the securities commissioner may apply to the district court of the city and county of Denver to temporarily restrain or preliminarily or permanently enjoin the act or practice in question ... *In any such action, the securities commissioner shall not be required to plead or prove irreparable injury or the inadequacy of the remedy at law.* (emphasis added)

Thus, the commissioner is not required to allege or prove irreparable harm, or exigent circumstances, when applying for a TRO and, therefore, need not comply with C.R.C.P. 65(b)(1).

884 ■

Defendants argue the commissioner withheld material facts from the judge issuing the *ex parte* TRO, more specifically, that search warrants had previously been issued and executed, that defendants were represented by counsel, and the existence of the *Banghart* case.

At the outset, and in apparent contradiction to the trial court's findings, the verified motion for a TRO specifically stated that parallel criminal proceedings were pending, that search warrants had been issued and executed in that proceeding, and that the depository banks had been notified that the deposits had been obtained by illegal activity.

Further, we have already discussed and resolved the failure of the commissioner to cite the *Banghart* case in both the affidavit in support of the search warrant and the application for the TRO.

The balance of defendants' assertion relates to the failure to disclose that defendants were represented by counsel, presumably in violation of C.R.C.P. 65(b)(2). However, the plain wording of C.R.C.P. 65(b)(2) places the obligation to notify counsel or parties, to state the efforts made to notify counsel or parties, or state reasons why counsel or parties should not be notified, on the applicant's counsel, not the applicant. In addition, the application states, in general terms, adequate reasons why counsel should not have been notified.

■ We agree that whenever a party or counsel applies for a TRO or other *ex parte* order, it should fully inform the court of all facts relevant to the issuance of the order. However, having complied with the applicable civil rules, the constitutionality of which have not been challenged, we cannot say that, in this instance, the failure to advise the trial court that defendants were represented by counsel in the parallel criminal matter violated any clearly established constitutional right.

Therefore, under the first prong of the *Brace* test, we conclude that, since the issuance of a TRO without a showing of irreparable injury is authorized by statute and is permitted without notice upon proper representation to the court as provided by rule, the commissioner's application for a TRO did not violate a clearly established due process right.

Accordingly, the order of the trial court denying the commissioner's motion for summary judgment is reversed, and the cause is remanded with directions to dismiss the counterclaim against the commissioner in his individual capacity.

Judge METZGER and Judge DAVIDSON concur.